FILED

JUNE 30, 2016

TN COURT OF
WORKERS' COMPENSATION
CLAIMS

Time 12:43 PM



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# IN THE COURT OF WORKERS' COMPENSATION CLAIMS
# AT MURFREESBORO

| | | |
|---|---|---|
| **ANGELA WOMACK** | ) | **Docket No.: 2015-05-0037** |
| **Employee,** | ) | |
| **v.** | ) | **State File No.: 57199-2014** |
| | ) | |
| **YOROZU AUTOMOTIVE TN** | ) | **Date of Injury: July 25, 2014** |
| **Employer,** | ) | |
| | ) | **Judge Dale Tipps** |
| | ) | |

---

## COMPENSATION HEARING ORDER

---

This matter came before the undersigned Workers' Compensation Judge on June 15, 2016, for a Compensation Hearing pursuant to Tennessee Code Annotated section 50-6-239 (2015). The central legal issues are: (1) whether the condition for which the employee, Angela Womack, seeks benefits arose primarily out of and in the course and scope of her employment with the employer, Yorozu Automotive TN; (2) whether Ms. Womack is entitled to temporary disability benefits, and if so, in what amount; (3) whether Ms. Womack is entitled to permanent disability benefits; and (4) whether Ms. Womack is entitled to past or future medical benefits.[1] For the reasons set forth below, this Court finds that Ms. Womack established by a preponderance of the evidence that she sustained an injury primarily arising out of and in the course and scope of her employment with Yorozu. Accordingly, the Court finds that Ms. Womack is entitled to medical benefits, temporary total disability benefits, and permanent partial disability benefits.

### History of Claim

Ms. Womack is a thirty-nine-year-old resident of Warren County, Tennessee. She testified she began working on Yoruzu's production line in October 2013. Her job required her to lift parts out of a bin, place them in a machine, activate a robotic welder,

---

[1] A complete listing of the technical record, stipulations, and exhibits admitted at the Compensation Hearing is attached to this Order as an appendix.

1

and then remove the part. The job required her to reach and pull with both arms. While unloading a bin on July 25, 2014, she pulled on a part that was stuck. She fell back and immediately felt a stabbing, burning pain in her right shoulder.

Ms. Womack reported the injury to her supervisor, who sent her to the company nurse. The nurse sent Ms. Womack home with instructions to rest over the weekend and apply heat and ice. Ms. Womack was feeling no better the following Monday, so the nurse gave her a panel of physicians, from which Ms. Womack selected Dr. Kyle Joyner.

Dr. Joyner first saw Ms. Womack on August 12, 2014. She reported a dull ache in the shoulder with residual sharp pain when she tried to raise her arm. Dr. Joyner assessed right shoulder pain with possible rotator cuff pathology, ordered an MRI, and assigned temporary restrictions. He last saw Ms. Womack on September 26, 2014, at which time he assessed "diffuse right shoulder pain following a strain-type injury." He noted she had "continued shoulder pain but no findings suggestive of structural injury on diagnostic studies." He had no surgical options to offer and referred Ms. Womack to Dr. Jeffrey Hazlewood for physiatry. He also continued her restrictions and indicated he would see her back as needed. (Ex. 7 at 1-11.) Dr. Joyner would later testify he did not believe Ms. Womack's subsequently discovered labral tear was present at the time he treated her. (Ex. 3 at 25.)

Ms. Womack saw Dr. Hazlewood on October 13, 2014. Dr. Hazlewood reviewed her records and performed a physical examination before concluding:

> Rather generalized shoulder pain status post injury as previously described. MRI scan was unremarkable, except for tendinitis type changes. She has significant guarding and limited range of motion of the shoulder that seems to outweigh objective findings in this case. I would call this rotator cuff tendinitis/sprain type injury, but I have difficulty explaining why she is not more than 20% improved almost three months out from the injury.

Dr. Hazlewood administered an injection and continued Ms. Womack's restrictions. (Ex. 7 at 15-16.)

Ms. Womack returned on October 20, 2014, and reported that she was no better. She felt she needed another MRI because "something has been missed." Although Ms. Womack was adamant that she continued to suffer significant shoulder pain, Dr. Hazlewood still saw no evidence of a tear in the original MRI. His impression was:

> Continued complaints of sever [sic] shoulder pain that I cannot explain. She has had an orthopedic surgeon that stated he really couldn't explain it either and called it a strain type injury. She had a MRI that was completely negative for tear. What I really can't explain is the significant

2

decreased active range of motion of only 30 degrees, which is consistent in my experience with a massive rotator cuff tear, and there is no way this MRI missed a massive rotator cuff tear. Therefore, I would have to state three months out from the injury that subjective symptoms outweigh any objective findings.

He further noted, "I must base work comp release at MMI on objective findings and not subjective pain complaints, and I will say regular duty. It is up to her whether she does her job or not." *Id.* at 26. In his deposition, Dr. Hazlewood testified he could not opine the labral tear was present or symptomatic at that time, or that Ms. Womack's July 25, 2014 injury caused it. (Ex. 6 at 24.)

Following Dr. Hazlewood's release, Ms. Womack attempted to return to work. She testified she tried to do her job for a half-hour to an hour, but could not do it because of her shoulder pain. She reported the problem to her supervisor, who consulted with Human Resources and sent her home.

Based on Dr. Hazlewood's opinion, Yorozu stopped paying for Ms. Womack's medical treatment after her maximum medical improvement (MMI) date of October 20, 2014. (*See* Parties' Stipulations.)[2] She later saw her personal physician with the intent of filing for leave under the FMLA. He refused to complete the FMLA paperwork, but referred her to an orthopedic specialist, Dr. Moore. She could not afford the therapy recommended by Dr. Moore and went without treatment for a time.

Ms. Womack began treating with Dr. Jeffrey Peterson on March 20, 2015. She reported right shoulder pain with activity and at rest since a work injury in July 2014. Dr. Peterson ordered another MRI, which showed "bone contusion, concern for labral tear." Due to Ms. Womack's continued pain and the failure of conservative measures, he recommended a right shoulder arthroscopy, which he performed on June 8, 2015. During the surgery, Dr. Peterson found no rotator cuff pathology, but discovered displacement of the labrum. He performed a labral repair (SLAP repair), as well as a subacromial decompression. *Id.* at 30-71. Dr. Peterson determined Ms. Womack reached MMI on December 17, 2015, and assigned a permanent impairment rating of 3% to the body. (Ex. 4 at 9.) He also opined the labral tear was directly related to her July 25, 2014 work injury. (Ex. 7 at 33; Ex. 4 at 44.)

Ms. Womack did not return to work after Dr. Peterson released her. Yorozu terminated her employment on November 2, 2015, for failure to return to work after medical leave. (*See* Parties' Stipulations.)

Both Ms. Womack and her daughter, Liliana Silva, testified at some length

---

[2] The parties' stipulated facts are contained in the Pre-Compensation Hearing Statements.

regarding Ms. Womack's condition following her accident and subsequent medical treatment. They described her nearly constant pain and difficulty performing the activities of daily living. Ms. Silva described having to do Ms. Womack's housework and helping her bathe and wash her hair. They said this continued without interruption from the work injury until after Ms. Womack's surgery with Dr. Peterson.

Ms. Womack filed a Petition for Benefit Determination (PBD) on August 5, 2015, seeking temporary and permanent disability and medical benefits. The parties did not resolve the disputed issues through mediation, and the Mediating Specialist filed a Dispute Certification Notice (DCN) on September 14, 2015. This Court conducted the Compensation Hearing on June 15, 2016.

At the Compensation Hearing, Ms. Womack asserted she is entitled to medical treatment, reimbursement of medical expenses, temporary disability benefits, and permanent disability benefits for her shoulder injury arising primarily out of and in the course and scope of her employment. She contended she has rebutted the statutory presumption of correctness attached to the causation opinions of Dr. Joyner. Specifically, she argued that the "objective pathology" relied upon by the authorized doctors is not the full picture of her medical condition. Instead, she contended Dr. Peterson treated her as a patient, not as an imaging study. She insisted his opinion is more reliable because he also considered her history and her subjective complaints, which were corroborated by his discovery of the labral tear.

Yorozu countered that Ms. Womack is not entitled to any additional workers' compensation benefits because she failed to present sufficient evidence that her labral tear arose primarily out of and in the course and scope of her employment. It argued the two authorized physicians opined Ms. Womack's SLAP repair was unrelated to her work accident and, pursuant to Tennessee Code Annotated section 50-6-102(14)(E) (2015), those opinions are presumed to be correct. Because Dr. Peterson based his causation opinion mainly on Ms. Womack's statements and could not definitively state the tear was present immediately following her work injury, his opinion is not sufficient to overcome the presumption of correctness attached to the ATP opinions.

**Findings of Fact and Conclusions of Law**

The following legal principles govern this case. Ms. Womack has the burden of proof on all essential elements of her claim. *Scott v. Integrity Staffing Solutions,* No. 2015-01-0055, 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Tenn. Workers' Comp. App. Bd. Aug. 18, 2015). "[A]t a compensation hearing where the injured employee has arrived at a trial on the merits, the employee must establish by a preponderance of the evidence that he or she is, in fact, entitled to the requested benefits." *Willis v. All Staff*, No. 2014-05-0005, 2015 TN Wrk. Comp. App. Bd. LEXIS 42, at *18 (Tenn. Workers' Comp. App. Bd. Nov. 9, 2015); *see also* Tenn. Code Ann. § 50-6-239(c)(6) (2015)

4

("[T]he employee shall bear the burden of proving each and every element of the claim by a preponderance of the evidence."). In analyzing whether Ms. Womack has met her burden, the Court will not construe the law remedially or liberally in her favor, but instead must construe the law fairly, impartially, and in accordance with basic principles of statutory construction favoring neither Ms. Womack nor Yorozu. *See* Tenn. Code Ann. § 50-6-116 (2015).

*Compensability*

Ms. Womack's burden includes proving her injury arose primarily out of and occur in the course and scope of the employment. Tenn. Code Ann. § 50-6-102(14) (2015). To do so, she must show her injury was "caused by a specific incident, or set of incidents, arising primarily out of and in the course and scope of employment, and is identifiable by time and place of occurrence." Tenn. Code Ann. § 50-6-102(14)(A) (2015). Further, she must show, "to a reasonable degree of medical certainty that it contributed more than fifty percent (50%) in causing the . . . disablement or need for medical treatment, considering all causes." Tenn. Code Ann. § 50-6-102(14)(C) (2015).

Applying these principles to the facts of this case, the Court finds Ms. Womack has met her burden and is entitled to the requested benefits. She described injuring her shoulder when she tried to pull a component from a bin on July 25, 2014, and felt immediate pain. This constitutes a specific incident, identifiable by time and place of occurrence, and Yorozu submitted no proof to the contrary.

Regarding the requirement of proving causation, the Court finds Dr. Peterson's opinion is sufficient to establish that Ms. Womack's work injury contributed more than fifty percent to the cause of her need for the SLAP repair. Dr. Peterson testified that it wasn't possible to pinpoint the date of the tear, but based on Ms. Womack's consistent history of pain from the date of her injury until surgical repair, he believed her SLAP tear was the direct result of her work injury. (Ex. 4 at 10, 39-44.) Because Ms. Womack had no prior history of problems with her shoulder, had an injury that did not show up on the MRIs, and had no improvement with conservative treatment, he concluded she suffered the tear at the time of her work injury. *Id.* at 11.

The testimony of Ms. Womack and Ms. Silva supports Dr. Peterson's conclusion. They both attested to Ms. Womack's near-constant pain and her physical difficulties. Ms. Silva described having to care for her mother and do most of her housework. They both confirmed Ms. Womack's problems began at the time of her work injury and continued without interruption until after her surgery. Not only was this testimony unrebutted, but the Court also finds that both witnesses appeared steady, forthcoming, reasonable, and honest, which characteristics, according to the Tennessee Supreme Court, are indicia of reliability. *See Kelly v. Kelly,* 445 S.W.3d 685, 694-695 (Tenn. 2014).

5

Yorozu contends the medical proof does not support a finding of a specific incident or injury. It relies on Dr. Hazlewood's opinion that he could not state the labral tear was present when he saw Ms. Womack or that the July 25, 2014 work injury caused the tear. Dr. Hazlewood based this conclusion on a number of factors, the first of which was that Dr. Joyner, a shoulder specialist, did not detect a labral tear when he examined Ms. Womack. He also felt Ms. Womack's range-of-motion testing was inconsistent with a labral tear. Finally, he did not understand how the work injury would have resulted in the bone bruising noted by Dr. Peterson during surgery. (Ex. 6 at 22-24.)

The Court finds the inability of Dr. Joyner to detect the labral tear is not determinative. It is important to note that Dr. Hazlewood and Dr. Peterson also failed to diagnose the tear, which is not surprising in light of the testimony from all three doctors that the SLAP tear might not appear on an MRI.[3] It remained undiagnosed until Dr. Peterson performed surgery. The mere fact that the first treating physician was unable to identify a condition that every subsequent doctor missed does not mean the condition did not exist. Rather, it may also indicate Ms. Womack's condition was simply difficult to diagnose, a conclusion supported by the facts that the tear actually existed at the time of surgery and that Ms. Womack suffered significant symptoms from the date of her work injury until the tear was repaired.

Regarding the range-of-motion testing, Ms. Womack testified that Dr. Hazlewood's testing caused a great deal of pain during her first visit. As a result, she tried to protect herself by self-limiting the motion of her shoulder when she saw him the second time. Ms. Womack made no attempt to hide her frustration with Dr. Hazlewood's manner and treatment during the hearing. While conflicts between physician and patient sometimes occur, they are not sufficient grounds for disregarding doctors' findings. However, in this matter, the Court finds Ms. Womack's explanation to be credible and sufficient to explain the inconsistent motion tests that raised doubts in Dr. Hazlewood's mind.

All three testifying doctors addressed the bone bruising noted by Dr. Peterson. Dr. Hazlewood stated bone marrow bruising is more of an acute event, not something that would be present chronically. *Id*. at 25. Dr. Joyner testified he would not expect bone bruising related to the initial trauma to be present at the time of Ms. Womack's surgery. Typically, bruising is something more acute and proximate to the finding. (Ex. 3 at 19-20.) Dr. Peterson felt the labral tear could have caused instability in the shoulder that resulted in a bone bruise. (Ex. 4 at 32-35.) The Court finds Dr. Peterson's explanation to be plausible, but determining the exact source of the bruising is not critical to resolving the question of the cause of the SLAP tear.

---

[3] Dr. Joyner also acknowledged Ms. Womack's SLAP tear might not be apparent in her physical examination. (Ex. 2 at 22.)

Yorozu stresses the importance of the bone bruising to suggest Ms. Womack must have suffered an intervening trauma shortly before Dr. Peterson performed surgery. While this scenario is a possibility, there is no direct evidence of any such event or injury. To the contrary, the lay testimony and the medical records establish that Ms. Womack quite consistently reported shoulder pain and dysfunction from the date of her initial injury until she recovered from surgery. Without more, the mere existence of unexplained bone bruising is insufficient to overcome the conclusion that the need for surgery was a direct result of her work injury.

Yorozu also contends that Dr. Peterson's opinion is speculative because he could not state definitively that Ms. Womack's work injury caused the SLAP tear. While it is true that Dr. Peterson agreed on cross-examination that he could not "definitively state that in July of 2014, she had a tear," he stated quite clearly that, to a reasonable degree of medical certainty her labral tear occurred on the date of her work injury. He based this conclusion on her history, his objective findings, and on how well she recovered following the surgery. (Ex. 7 at 44.)

Yorozu contends this further bolsters its claim that Dr. Peterson's opinion is speculative. It objects to his reliance on statements made by Ms. Womack regarding the work injury and her subsequent problems, rather than her prior medical records or diagnostic studies. The problem with this argument is there is no evidence suggesting the history given by Ms. Womack was unreliable. Yorozu's line of reasoning requires a finding that Ms. Womack reported an injury in July 2014, complained of pain and incapacity for eight months, refused to return to work and waived earning any income for much of that time, while importuning her daughter to help her with her personal grooming and her housework; all in spite of the fact that nothing was really wrong with her shoulder. Then, shortly before Dr. Peterson operated on her shoulder, she suffered some sort of trauma that just happened to tear the labrum and bruise the bone in the same shoulder. While this level of cunning is not impossible, it seems improbable. The more likely explanation is the simpler one – that Ms. Womack's condition was caused by the work accident and was resolved by Dr. Peterson's surgical repair. The fact that the imaging studies failed to show the labral tear is not determinative.

Yorozu is correct that because Ms. Womack selected Dr. Joyner from a panel of physicians, Tennessee Code Annotated section 50-6-102(14)(E) (2015) establishes a presumption of correctness for any causation opinion given by Dr. Joyner.[4] However, the statute is clear that this presumption may be overcome by a preponderance of the evidence. As noted above, the Court finds that the preponderance of the expert and lay evidence establishes that Ms. Womack's work injury was most likely the primary cause of Ms. Womack's SLAP tear.

---

[4] Dr. Hazlewood's opinion is not entitled to the statutory presumption of correctness because the parties submitted no evidence showing Ms. Womack selected him from a panel.

*Temporary Disability Benefits*

An injured worker is eligible for temporary total disability (TTD) benefits if: (1) the worker became disabled from working due to a compensable injury; (2) there is a causal connection between the injury and the inability to work; and (3) the worker established the duration of the period of disability. *Jones v. Crencor Leasing and Sales*, No. 2015-06-0332, 2015 TN Wrk. Comp. App. Bd. LEXIS 48, at *7 (Tenn. Workers' Comp. App. Bd. Dec. 11, 2015) (citing *Simpson v. Satterfield*, 564 S.W.2d 953, 955 (Tenn. 1978)).

Temporary partial disability (TPD) benefits, a category of vocational disability distinct from temporary total disability, are available when the temporary disability is not total. *Id.; see also* Tenn. Code Ann. § 50-6-207(1)-(2) (2015). Specifically, "[t]emporary partial disability refers to the time, if any, during which the injured employee is able to resume some gainful employment but has not reached maximum recovery." *Id.* (citing *Williams v. Saturn Corp*., No. M2004-01215-WC-R3-CV, 2005 Tenn. LEXIS 1032, at *6 (Tenn. Workers' Comp. Panel Nov. 15, 2005)). Thus, in circumstances where the treating physician has released the injured worker to return to work with restrictions prior to maximum medical improvement, and the employer either (1) cannot return the employee to work within the restrictions or (2) cannot provide restricted work for a sufficient number of hours and/or at a rate of pay equal to or greater than the employee's average weekly wage on the date of injury, the injured worker may be eligible for temporary partial disability. *Id.*

Ms. Womack claims to be entitled to TTD benefits for the period of October 2014, when she found she was unable to do her job after Dr. Hazlewood found her to be at MMI, through December 17, 2015, when Dr. Peterson released her to full duty. The evidence presented does not support this contention. The only period of total disability appears to be two weeks post-surgery. (Ex. 4 at 48.) The remaining claim for temporary disability benefits is for TPD, based either on restrictions from Dr. Peterson or Ms. Womack's claim she was unable to perform her regular job at Yorozu.

As noted above, eligibility for TPD requires a showing that the employer cannot fully return the injured worker to work within the medical restrictions. Yorozu provided light duty work for Ms. Womack while she was under medical restrictions from Dr. Joyner and Dr. Hazlewood. When Ms. Womack returned to work after Dr. Hazlewood's MMI pronouncement in October 2014, she was under no medical restrictions. Instead, she tried to do her regular work for approximately half an hour before informing her supervisor she was unable to perform the job. She testified her supervisor sent her home. She requested FMLA paperwork from Yorozu, but for some reason, never completed or returned them.

This alleged first period of disability is particularly problematic because Ms. Womack was not under any medical restrictions at the time. From the perspective of Yorozu, it had already provided all required benefits, including light duty and treatment with two doctors, both of whom had released Ms. Womack to full duty. Although Ms. Womack told her manager she could not perform her regular job, her actions suggested she intended to apply for FMLA leave. Ms. Womack presented no admissible evidence regarding whether she had further contact with Yorozu, whether she offered it any opportunity to accommodate her with additional light duty, or whether it could have accommodated her condition. Without any indication that Ms. Womack communicated some need for additional medical treatment or additional light duty, the Court finds Yorozu had no meaningful opportunity to return her to work within her self-imposed restrictions.

Dr. Peterson testified Ms. Womack would have had temporary medical restrictions for a period of three months following her surgery. *Id.* Again, Ms. Womack presented no evidence to suggest she made Yorozu aware of these medical restrictions or offered it a chance to accommodate them. Under the circumstances, the Court cannot find Ms. Womack has met her burden of proving eligibility for TPD benefits.

*Permanent Disability Benefits*

For post-July 1, 2014 injuries, permanent partial disability is paid at sixty-six and two-thirds percent of the injured employee's average weekly wage for the period of compensation as determined by multiplying the employee's impairment rating by 450 weeks. Tenn. Code Ann. § 506-207(3)(A) (2015). In this case, Ms. Womack's stipulated impairment rating is two percent to the body, giving her a period of compensation of nine weeks. Her stipulated compensation rate is $304.43. Therefore, her "original award" is $2,739.87.

Tennessee Code Annotated section 50-6-207(3)(B) (2015) provides:

If at the time the period of compensation provided by subdivision (3)(A) ends, the employee has not returned to work with any employer or has returned to work and is receiving wages or a salary that is less than one hundred percent (100%) of the wages or salary the employee received from his pre-injury employer on the date of injury, the injured employee may file a claim for increased benefits. If appropriate, the injured employee's award as determined under subdivision (3)(A) shall be increased by multiplying the award by a factor of one and thirty-five one hundredths (1.35).

Based on Dr. Peterson's testimony and the parties' stipulation, Ms. Womack reached MMI on December 17, 2015. Thus, her nine-week initial compensation period

9

expired on February 18, 2016. At that time, Yorozu had already terminated Ms. Womack, and she was unemployed. She thus claimed she is entitled to the 1.35 times enhancement factor of her original award. Yorozu argued that no enhancement of the award is appropriate because Ms. Womack's decision not to return to work was purely personal and unrelated to her employment.

Ms. Womack admitted on cross-examination that her decision not to return to work since Dr. Peterson released her was a purely personal one. She is not working because she decided to become a full-time college student in the fall of 2014, studying social science. She also works as a volunteer at a facility called The Hope Center.

Tennessee Code Annotated section 50-6-207(3)(D)(i) (2015), provides that an employee will not be entitled to additional benefits if "[t]he employee's loss of employment is due to the employee's voluntary resignation or retirement; provided, however, that the resignation or retirement does not result from the work-related disability." No appellate tribunals have yet addressed the applicable statute. However, even though prior law only addressed the applicability of a cap on benefits when an employee failed to return to work for the pre-injury employment, the "meaningful return to work" analysis used in return-to-work cases under prior law appears to be relevant.[5]

The Supreme Court, interpreting the prior statute, held that "if an employee retires or resigns or declines an offer to return to work for either personal or other reasons that are not related to his or her workplace injury, the employee has had a meaningful return to work and is subject to the one-and-one-half-times cap." *Cha Yang v. Nissan N. Am., Inc.*, 440 S.W.3d 593, 600 (Tenn. 2014). The principle behind this approach was, "an employee cannot avoid the statutory caps and thereby augment his award through his unilateral acts when those acts are unrelated to the injury." *Lay v. Scott Cnty. Sheriff's Dep't.*, 109 S.W.3d 293, 299 (Tenn. 2003).

Section 50-6-207(3)(D)(i) appears to be based on the same principle – that an employee cannot increase her permanent disability award through unrelated unilateral acts. While Ms. Womack's employment status on February 18, 2016, was not "due to [her] voluntary resignation or retirement;" the reason she was not working on that date was strictly personal and not related to her work injury. The Court finds this precludes any award of additional permanent disability benefits.

---

[5] The Tennessee Workers' Compensation Appeals Board allows reliance on precedent from the Tennessee Supreme Court "unless it is evident that the Supreme Court's decision or rationale relied on a remedial interpretation of pre-July 1, 2014 statutes, that it relied on specific statutory language no longer contained in the Workers' Compensation Law, and/or that it relied on an analysis that has since been addressed by the general assembly through statutory amendments." *McCord v. Advantage Human Resourcing,* No. 2014-06-0063, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *13 n.4 (Tenn. Workers' Comp. App. Bd. Mar. 27, 2015).

## Medical Expenses

"[T]he employer or the employer's agent shall furnish, free of charge to the employee, such medical and surgical treatment . . . made reasonably necessary by accident[.]"  Tenn. Code Ann. § 50-6-204(a)(1)(A) (2015).  Having found that Ms. Womack's SLAP tear constituted a compensable work injury, the Court finds Yorozu is responsible for the costs associated with treating that condition, including reimbursement of Ms. Womack's out-of-pocket expenses for medical treatment.  The parties stipulated the amount of these expenses to be $3,481.48.

**IT IS, THEREFORE, ORDERED** as follows:

1. Medical care for Ms. Womack's injuries shall be paid, including all expenses related to Dr. Peterson's treatment of the SLAP tear, and Yorozu or its workers' compensation carrier shall continue to provide Ms. Womack with medical treatment for these injuries as required by Tennessee Code Annotated section 50-6-204 (2015).  Dr. Peterson shall be designated the authorized treating physician for any future care.  Medical bills shall be furnished to Yorozu or its workers' compensation carrier by Ms. Womack or the medical providers.

2. Yorozu shall reimburse Ms. Womack for her out-of-pocket medical expenses of $3,481.48.

3. Yorozu shall pay past due temporary total disability benefits of $608.86 for the period from June 8, 2015, to June 23, 2015.

4. Yorozu shall pay $2,739.87 in permanent partial disability benefits.

5. Ms. Womack's attorney is awarded an attorney's fee of twenty percent.

6. Costs of this cause of $150.00 are assessed against Yorozu, pursuant to Tenn. Comp. R. and Reg. 0800-02-21-.07 (2015), to be paid within five days of this order becoming final.

7. Yorozu shall prepare and file a statistical data form within ten business days of the date of this order, pursuant to Tennessee Code Annotated section 50-6-244.

8. After a Compensation Hearing Order entered by a Workers' Compensation Judge has become final in accordance with Tennessee Code Annotated section 50-6-239(c)(7) (2015), compliance with this Order must occur in accordance with Tennessee Code Annotated section 50-6-239(c)(9) (2015).  The Insurer or Self-Insured Employer must submit confirmation of compliance with this Order to the

Bureau by email to WCCompliance.Program@tn.gov no later than the fifth business day after this Order becomes final or all appeals are exhausted. Failure to submit the necessary confirmation within the period of compliance may result in a penalty assessment for non-compliance.

**ENTERED this the 30th day of June, 2016.**

_____
**Dale Tipps**
**Workers' Compensation Judge**

Right to Appeal:

Tennessee Law allows any party who disagrees with this Compensation Hearing Order to appeal the decision to the Workers' Compensation Appeals Board or the Tennessee Supreme Court. To appeal your case to the Workers' Compensation Appeals Board, you must:

1. Complete the enclosed form entitled: "Compensation Hearing Notice of Appeal."

2. File the completed form with the Court Clerk *within thirty calendar days* of the date the Workers' Compensation Judge entered the Compensation Hearing Order.

3. Serve a copy of the Compensation Hearing Notice of Appeal upon the opposing party.

4. The appealing party is responsible for payment of a **filing fee in the amount of $75.00.** Within ten calendar days after the filing of a notice of appeal, payment must be received by check, money order, or credit card payment. Payments can be made in person at any Bureau office or by United States mail, hand-delivery, or other delivery service. In the alternative, the appealing party may file an Affidavit of Indigency, on a form prescribed by the Bureau, seeking a waiver of the filing fee. The Affidavit of Indigency may be filed contemporaneously with the Notice of Appeal or must be filed within ten calendar days thereafter. The Appeals Board will consider the Affidavit of Indigency and issue an Order granting or denying the request for a waiver of the filing fee as soon thereafter as is practicable. **Failure to timely pay the filing fee or file the Affidavit of Indigency in accordance with this section shall result in dismissal of the appeal.**

12

5. The party filing the notice of appeal, having the responsibility of ensuring a complete record on appeal, may request, from the Court Clerk, the audio recording of the hearing for the purpose of having a transcript prepared by a licensed court reporter and filing it with the Court Clerk within fifteen calendar days of the filing of the Compensation Hearing Notice of Appeal. Alternatively, the party filing the appeal may file a joint statement of the evidence within fifteen calendar days of the filing of the Compensation Hearing Notice of Appeal. The statement of the evidence must convey a complete and accurate account of what transpired in the Court of Workers' Compensation Claims and must be approved by the workers' compensation judge before the record is submitted to the Clerk of the Appeals Board. *See* Tenn. Comp. R. & Regs. 0800-02-22-.03 (2015).

6. After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Workers' Compensation Appeals Board, the appeal will be docketed and assigned to an Appeals Board Judge for review. At that time, a docketing notice shall be sent to the parties. Thereafter, the parties have fifteen calendar days to submit briefs to the Appeals Board for consideration. *See* Tenn. Comp. R. & Regs. 0800-02-22-.02(3) (2015).

**To appeal your case directly to the Tennessee Supreme Court, the Compensation Order must be final and you must comply with the Tennessee Rules of Appellate Procedure. If neither party timely files an appeal with the Appeals Board, this Order will become final by operation of law thirty calendar days after entry pursuant to Tennessee Code Annotated section 50-6-239(c)(7).**

13

**APPENDIX**

Technical record:

1. Petition for Benefit Determination
2. Post-Discovery Dispute Certification Notice
3. Employee's Pre-Hearing Statement and Stipulations
4. Employer's Pre-Hearing Statement and Stipulations
5. Employee's Compensation Pre-Hearing Brief
6. Employer's Compensation Pre-Hearing Brief

The Court did not consider attachments to Technical Record filings unless admitted into evidence during the Compensation Hearing. The Court considered factual statements in these filings or any attachments to them as allegations unless established by the evidence.

Exhibits:

1. C-41 Wage Statement
2. BCBS Explanation of Benefits
3. Deposition Transcript of Dr. Kyle Joyner
4. Deposition Transcript of Dr. Jeffrey Peterson
5. Deposition Transcript of Angela Womack
6. Deposition Transcript of Dr. Jeffrey Hazlewood
7. Indexed Medical Records with Table of Contents

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Compensation Hearing Order was sent to the following recipients by the following methods of service on this the 30th day of June, 2016.

| Name | Certified Mail | Via Fax | Via Email | Service sent to: |
|------|----------------|---------|-----------|------------------|
| Benjamin Newman | | | X | bnewman@galligannewmanlaw.com |
| D. Brett Burrow | | | X | bburrow@burrowlee.com |

_____

**PENNY SHRUM, COURT CLERK**
wc.courtclerk@tn.gov

15